**FILED**

APR  3 2007

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

CONNIE F. HARRIS,
      Plaintiff,

v.                               **Civil Action No. 3:06CV94**
                                   **(Judge Keeley)**

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,
      Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying

her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB")

under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433,

1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been

referred to the undersigned United States Magistrate Judge for submission of proposed findings of

fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

### I. Procedural History

Connie F. Harris ("Plaintiff") filed applications for DIB and SSI on January 29, 2004,

alleging disability beginning February 18, 2002, due to fibromyalgia, spurs in neck, and disc damage

(R. 50, 60, 247).   Both applications were denied initially and on reconsideration (R. 32, 39, 250,

256). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Karl Alexander held

on April 7, 2005 (R. 260). Plaintiff, represented by counsel, was present and testified, as did

---

[1]  On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security.
Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be
substituted, therefore, for former Commissioner Jo Anne B. Barnhart (or Acting Commissioner
Linda L. McMahon [if the caption was changed previously]) as the defendant in this suit.

Vocational Expert Larry Ostrowski ("VE") (R. 260). On June 27, 2005, the ALJ issued an unfavorable decision (R. 23). On June 13, 2006, the Appeals Council denied Plaintiff's request for review (R. 6), rendering the ALJ's decision the final decision of the Commissioner.

## II. Statement of Facts

Connie Harris ("Plaintiff") was born on July 29, 1966, and was 39 years old at the time of the ALJ's decision (R. 50). She has a high school equivalency diploma and past work experience including employment as a dishwasher (R.17). She worked as a dishwasher/food server/cleaner for University Hospitals in Morgantown, West Virginia, from 1998 until August 2002, when she stopped working due to her impairments (R. 61). She alleges she became unable to work in February 2002. After that she was given light duty work at her job, but was terminated in August 2002, when she was unable to transition back to her regular job within 90 days.

On February 20, 2002, Plaintiff presented to the Family Medical Center at West Virginia University with a chief complaint of right shoulder pain (R. 246). She reported an initial injury two days earlier (February 18, her alleged onset date) when lifting some heavy dishes at work. She reported arm, shoulder, and back pain since then. She had tried minimal amounts of over-the-counter Ibuprofen without relief. She denied any weakness or paresthesias.

Musculoskeletal exam showed 5 out of 5 motor strength in both upper and lower extremities. She was neurovascularly intact. She had moderate tenderness to palpation over the right trapezial/scapular area with questionable spasm. There was no shoulder instability or tenderness, and she had full range of motion. Plaintiff was assessed with right trapezial strain and prescribed Naprosyn and Flexeril.

On February 25, 2002, Plaintiff told Dr. Gross at Family Medicine that she was supposed to

2

come back for a return to work excuse, but that she was really not improved. X-rays were all negative. The medications seemed to help, but the more she tried to use her arm, the more discomfort she had "and in her job she does a lot of lifting of dishes and food in the cafeteria here at Health Sciences."

Upon examination, Plaintiff had point tenderness over the lateral portion of the right trapezius. She had no cervical motion tenderness or limitations. She had point tenderness over the brachial bursa. She had limited motion with external rotation secondary to pain as well as to raising above 90 degrees abduction. Her hand strength was equal bilaterally. Her pulses and reflexes were equal bilaterally.

Dr. Gross assessed brachial bursitis and trapezius strain. She gave Plaintiff an off-work slip for two more weeks, and referred her to physical therapy three times a week for range of motion strengthening and modalities.

On February 28, 2002, Plaintiff presented to Healthworks Rehab and Fitness for a right shoulder evaluation (R. 152). Plaintiff told the evaluator her job required she be able to lift and carry heavy objects frequently. Her chief complaint was pain in her right shoulder and arm, described as a dull aching and numbness. She rated the pain as 6 on a scale of 1-10. The assessment was right shoulder impingement syndrome with associated trigger points due to guarding of the shoulder (R. 154).

After two weeks of physical therapy, Plaintiff reported significant reduction in pain (R. 149).

On March 11, 2002, Plaintiff followed up at Family Medicine (R. 244). She reported marked improvement with a decrease in pain from physical therapy, but still had limited range of motion. She also said the Flexeril seemed to wear off by 3 a.m., after which she would be awake the rest of

the night with a lot of tenderness and stiffness.

Upon examination, Plaintiff still had some point tenderness throughout the scapula and right trapezius, and very limited range of motion secondary to pain in the right shoulder, but her grip was strong and her reflexes were equal. She was given another two weeks off work along with another two weeks of physical therapy.

By March 26, 2002, Plaintiff reported to her physical therapist that she could get her arm over her head (R. 146). She was not pain free but the pain had decreased.

On April 1, 2002, Plaintiff told Family Medicine that she had a lot of improvement with range of motion in physical therapy. She was not taking Ultram except as needed, "maybe every other day or every second day." She was still taking Naproxen as scheduled.

Upon examination, range of motion was much improved, but she still had some point tenderness over the cervical spine and scapula. The bursa was much improved. Strength was 5/5 and equal in both hands and muscle mass was equal in both arms. She was assessed with right shoulder pain.

By April 4, 2002, Plaintiff reported no resting pain, and that the tingling almost gone. She could now lie down on the injured shoulder (R. 144).

On April 11, 2002, Plaintiff had no pain at rest and the tingling in her fingers was gone (R. 142). She was not tender to palpation. Her doctor approved her for two more weeks of physical therapy and approved her for light duty work starting on April 30, 2002.

On April 16, Plaintiff was still improving, and could sleep (R. 242). Her range of motion was improved. Strength was still 5/5. She was diagnosed with right shoulder pain-improving, and was told she could go back to work in two weeks.

On April 30, Plaintiff reported she was "doing wonderful" (R. 241). She had been discharged from physical therapy with increased range of motion. She was not taking any pain medications, just her anti-inflammatories. She had some tenderness with increased mobility of the shoulder, but had improvement of range of motion. Upon examination, Plaintiff's motion was still limited but she could move in all planes without assistance and her grip strength was still 5/5. She was to go back to modified work in a week–with a recommendation of working no more than five 4-hour shifts per week for the next three to four weeks. She should also not lift more than 10 pounds, with no forceful pushing, pulling or overhead work.

One month later, Plaintiff reported she had been working in billing and accounts payable and was doing some filing (R. 240). She had been "tolerating it okay, but . . . had a couple of mornings where she . . . woke[] up very stiff." She took over-the-counter Motrin that seemed to help a little bit. She still used Flexeril at bedtime on "really bad days." Overall, she was doing "quite well." She wondered if she should be continued at the modified level for another couple of weeks.

Upon examination, Plaintiff had "great range of motion, limited only by some stiffness in full abduction at the ear." Strength and reflexes were equal in both arms.

Plaintiff was diagnosed with "Right shoulder strain, stable." She was continued on modified work for another four weeks.

On May 19, 2002, Plaintiff reported the light duty had been going quite well until she "lifted up a heavy chart, probably greater than 10 pounds" (R. 239). She had some spasm of the neck and a headache for the next two days. This was now beginning to resolve. Upon examination, she had full range of motion of the shoulder, limited only at full adduction; minimal tenderness to palpation, and no spasm. She was diagnosed with right shoulder injury, continuing to improve. She was

continued on light duty for another four weeks with possible discharge to her regular job afterward.

Two months later, in July 2002, Plaintiff reported occasional pain with repetitive motions above the head or with lifting (R. 238). She rarely took ibuprofen, and needed no other medications. She had no night pain. She said she was ready to return to full-time work. Upon examination Plaintiff had minimal tenderness with full passive and active range of motion and no crepitus. Strength was full throughout the right arm, with no sensory deficits and no cervical midline tenderness. She was to advance to full-time hours with the same exertional restrictions.

On August 23, 2002, Plaintiff's Workers' Compensation claims manager noted that Plaintiff had been back off work since August 6, because her transitional duty period with her employer had expired (R. 185). She was currently able to lift a maximum of 10 pounds, while her pre-injury job required lifting of 50 pounds. She had been released to modified duty on May 6, 2002, but was not released to full duty during the employer's 90-day transitional duty period, and was therefore considered temporarily totally disabled since August 6, 2002.

On August 29, 2002, Plaintiff returned to physical therapy (R. 135). She reported right shoulder pain for the past two weeks after she slipped from a step stool. She had been 100% pain free until then, but now the pain was of the same type as before, but was less intense.

A September 21, 2002, right shoulder x-ray showed a rotator cuff tendinopathy with small focal full-thickness tear (R. 173).

An MRI of the right shoulder that same day showed slight fluid in the shoulder joint and slight fluid within the tendon sheath of the long head of the biceps tendon that the reviewer opined might relate to communication with the shoulder or biceps tendinitis. There was also a mild thickening of tendons of the rotator cuff, compatible with mild tendinopathy (degenerative change, tendinosis, tendinitis) of the rotator cuff. Slight fluid was noted in the AC joint. There was mild

increased signal likely indicative of bursitis, and possibly a small focal full-thickness tear of the rotator cuff.

Plaintiff returned to Family Medicine on November 20, 2002 (R. 236). She reported no worsening or improvement since her last visit. Upon examination she had a positive painful arc with a little bit of weakness. She had decreased internal rotation of the right shoulder. She had tenderness over the biceps and a little bit over the supraspinatus tendon, and positive impingement sign. MRI showed some bursitis as well as tendinosis and some impingement. She was diagnosed with right shoulder strain with impingement.

A December 16, 2002, right shoulder x-ray showed "subtle osteophyte formation with tiny spurs along the inferior margin of the acromion and the clavicle at the [AC] joint . . . indicative of mild degenerative joint disease" (R. 171). There was also a flame shaped sclerotic area projecting along the surgical neck and anatomic neck of the humerus, likely related to healing fibrous cortical defect. There was no evidence of fracture or dislocation.

The next day Dr. Stoll wrote a letter to Workers' Compensation, stating that Plaintiff had injured her shoulder at work on February 18, 2002, but "did not notice a specific mechanism or injury. She did notice some crampy pain in the region of her trapezius and posterior shoulder musculature. She was able to finish her shift taking Tylenol; however, the pain got progressively worse. Since that time she had been able to work. She did not have specific pain associated with overhead activity, and had no symptoms of instability. She had been taking Naprosyn and Tranadol and she said the pain radiated from her shoulder down to her elbows. She had not noticed any weakness. Her symptoms were primarily pain on the top of her shoulder.

Upon examination there was no gross asymmetry of the shoulder. She was tender to

palpation about the AC joint, but nontender otherwise. Passive and active range of motion was without any difficulty or pain and she had no weakness of the rotator cuff muscles and no evidence of instability. O'Brien's active compression test was not specific; Speed's test was positive and caused pain in the region of the AC joint; and right elbow and wrist exams were unremarkable as was her spine exam. She did have some symptoms consistent with carpal tunnel syndrome.

The doctor opined that Plaintiff was "most likely suffering from some AC arthrosis" (R. 169). He tried to give her a steroid injection but was unable to inject more than 1cc of the medication. He gave her a prescription for physical therapy and switched her to NSAID from Naprosyn because the "Naprosyn has not really been helping her."

On January 22, 2003, Plaintiff told Dr. Stoll the AC injection had helped. She said some of the pain had recurred, but it continued to help. The doctor noted Plaintiff was working hard in physical therapy and her strength was coming back "rather nicely." Upon examination Plaintiff had full range of motion of the shoulder; intact stability; intact neurovascular; and strength approaching that of the other side. The doctor wanted her to continue physical therapy for three more weeks then she could return to work on February 17, 2003.

Plaintiff was diagnosed with right AC arthrosis. The doctor wanted her evaluated for other job opportunities within the WVU Hospitals systems and the possibility of cross training as she was very ambitious to start back to work.

Plaintiff continued Physical Therapy through January 30, 2003 (R. 106). At that time she was starting some new exercises and seemed to complete them without difficulty. She showed no outward sign of discomfort or pain. She complained one time when using heavy weight, which was then cut back, but had no other problems with weight or the exercise program.

On February 26, 2003, Plaintiff underwent a Functional Capacity Evaluation ("FCE") by physical therapist Phil Cooke (R. 186). Mr. Cooke noted Plaintiff suffered a right shoulder injury in February 2002, while working in the kitchen at Ruby Memorial Hospital, when she was washing dishes and felt pain throughout the right shoulder and scapular region. Her symptoms worsened and she was referred to Family Medicine, initiating treatment with Dr. Long. She received physical therapy and returned to work on light duty for 90 days. She completed her light duty but was unable to return to her normal job activity and was therefore not currently working. MRI showed arthritic changes and inflamed soft tissue. X-rays showed no significant findings. Plaintiff used Ibuprofen consistently and Ultram as needed. She reported constant dull pain throughout the right shoulder with pain radiating into the right scapular and right cervical region. She reported periodic numbness radiating in to the right hand and fingers.

Upon examination Plaintiff's movement pattern appeared normal throughout all cervical planes (R. 186). There was no warmth, swelling or discoloration noted. She reported pain with palpation throughout the right shoulder soft tissue. Increased pain was noted at the end of ranges of motion of the right shoulder. Functional strength was noted throughout all major muscle groups of the right shoulder and upper extremity. She reported pain with manual muscle testing, however, and weakness was noted compared to the left side. Sensation was intact throughout the right arm although she reported periodic numbness in the right hand and fingers. Deep tendon reflexes were active and symmetrical throughout both arms.

Mr. Cooke noted that Plaintiff exhibited some mechanical and strength deficits (R. 188). She demonstrated adequate biomechanical tolerance for sustained activity. Mr. Cooke concluded that Plaintiff could function independently in the competitive labor market with accommodation. He

9

determined that Plaintiff could work at the light exertional level with restrictions on reaching with the right arm secondary to pain and lifting above the shoulder. She could occasionally lift 20 pounds up to her shoulder level, and frequently lift up to 25 pounds to her shoulder level.

On March 19, 2003, Plaintiff reported to Family Medicine that her symptoms had not improved much, with some pain in the use of her right arm, especially about the horizontal level. She was using NSAIDS for pain. Upon examination, she was diffusely tender all around the right AC as well as up into the superior trapezius and right cervical paravertebral muscles; had pain with active range of motion up to about 70 degrees of abduction; had full passive range of motion with pain above 90 degrees of abduction; had strength limited secondary to pain; and had no obvious muscle atrophy.

On April 16, 2003, Plaintiff reported to Dr. Long that she had had no further improvement (R. 230). She had completed physical therapy. Her physical therapist opined she would be unable to go back to her regular job and needed retraining. Plaintiff stated she had about the same symptoms. The pain was most severe with lifting things or raising above her shoulder. The pain was mostly in her shoulder but went up into her neck. Upon examination, Plaintiff had diffuse tenderness around the right AC and the superior trapezius and paravertebral muscles and cervical area with no spasm, and with full range of motion (with pain beyond 90s degree abduction). She was weaker in her right arm than her left.

Dr. Long agreed Plaintiff needed vocational services and retraining to find another line of work as she was limited to lifting anything above shoulder height or lifting in general with her right arm.

On May 29, 2003, Plaintiff was examined by orthopedic surgeon P. Kent Thrush, M.D., for

the State Workers' Compensation division (R. 195). Plaintiff told Dr. Thrush she experienced pain in her right shoulder after lifting at work. She complained of chronic aching about the right shoulder, and stated she could only lift 20 pounds, while her job required lifting of 50 pounds (R. 196). She was taking Ultram and Voltaren, and stated she had not made any significant improvement in the last four to five months. She also complained of numbness in the fourth and fifth fingers of the right hand in the morning when she woke up, but then it dissipated. She was "doing light work only around the house." She did not drive and did not have a drivers' license. She wanted to go back to her old job, but could not perform the lifting required.

Upon physical examination Plaintiff's range of motion of the right shoulder was slightly restricted, and she had no significant crepitation. Circumference of the mid forearm and mid upper arm was equal right and left. Reflexes were 1+ bilaterally and peripheral pulses were also equal in both arms. Plaintiff had normal sensation of both arms. She had no atrophy in the shoulder, forearm or hand. She had full extension and flexion of both elbows, normal radial and ulnar deviation of the wrists; normal flexion and extension of both wrists. MRI was consistent with tendinitis of the rotator cuff but with no evidence of significant rotator cuff tear.

Dr. Thrush diagnosed right shoulder sprain and chronic subacromial bursitis tendinitis. He opined Plaintiff had reached maximum medical improvement and he did not recommend any additional treatment. He concluded Plaintiff had a 3% impairment of the upper extremity secondary to loss of range of motion, which translated to a 2% whole person impairment. He felt she definitely needed help in trying to reenter the workforce.

On June 2, 2003, Plaintiff reported continued right shoulder pain, pain with lifting above her head, and very intermittent and brief numbness and tingling in her right arm down to her fingers,

with no weakness noted (R. 229). Upon examination she had tenderness all around the AC joint and trapezius. She had no midline tenderness. She had pain on arc, but full range of motion. She had good grip strength and no evidence of weakness. She was diagnosed with continued right shoulder pain. Dr. Long opined that Plaintiff would be limited if she were to go back to work to weight lifting restrictions; no pushing or pulling; no overhead lifting; and limited use of her right arm.

On June 24, 2003, Plaintiff underwent a cervical MRI which revealed disc herniation of extrusion configuration at the C6-7 level, causing some mild central canal and left neuroforaminal narrowing and numerous lymph nodes which were not abnormally enlarged (R. 227).

On July 8, 2003, Plaintiff told Dr. Long she had worsening of her neck pain since her last visit, with pain, numbness, and tingling down her arms, all the way down to her fingers, which was becoming more permanent and constant (R. 226). She felt weak at times and most activities involving the upper arms caused increase in pain. She took an occasional Tylenol 3 to help her sleep but this was not strong enough and she was up all night in tears secondary to pain.

Upon examination, Plaintiff was extremely tender around her cervical spine as well as the paravertebral muscles and a little bit over the superior trapezius bilaterally. She had good grip strength and reflexes. There were subjective sensory changes with testing. The MRI showed disk herniation causing some mild central canal and left neural foraminal narrowing. Dr. Long referred her to neurosurgery for evaluation, noting radicular symptoms that were becoming more persistent, constant, and bilateral. He gave her a prescription for Lortab.

On August 5, 2003, Plaintiff reported progressive symptoms, including numbness in both hands going into her fingers. She also reported feeling weak and occasionally dropping things secondary to this paresthesias. She reported chronic neck pain worse at night, and was now sleeping

in a recliner. She had a lot of pain in her right shoulder. NSAIDS were starting to bother her stomach, so she discontinued them except as needed, and took one or two Lortab which helped her sleep.

Upon examination, Plaintiff had full range of motion with pain. She had some tenderness around her cervical spine into her right trapezius and around her right AC joint. She had subjective sensory deficits in the right third, fourth, and fifth fingers. She had slightly weaker triceps with normal biceps.

Plaintiff presented to neurosurgery on September 22, 2003, with complaints of neck pain and bilateral arm pain, right more than left (R. 162). Plaintiff told the doctor that she "was lifting dishes and taking out the garbage sometime on 02/18/2002 while she was working at a cafeteria and she had a subsequent neck and bilateral shoulder pain at that time with radiation of this pain mostly on the right than on the left with numbness to the right third, fourth and fifth fingers." Occasionally she had some numbness particularly of the right hand and had been dropping things with the right hand. She also had some intermittent sharp pain of the bilateral shoulders and right arm described as a dull pain. She was not sleeping well and not comfortable with the pain symptoms. The pain was worse with activity or running the vacuum cleaner. She had some relief with medications, which she took as needed. She had physical therapy for her shoulder sprain without much relief. She had cortisone injection without much relief. She had some weakness of her right arm.

Upon examination, Plaintiff had decreased strength of the right arm in the biceps, triceps and with grip. She had full strength on the left. She had decreased sensation in the right hand, third, fourth, and fifth digits. Reflexes were intact bilaterally. She had mild Hoffman's on the right, negative on the left. Negative Babinski. Negative clonus. Review of the cervical MRI done on June

24, 2003, showed cervical spine degenerative disk disease and degenerative joint disease.

The doctor opined that Plaintiff had degenerative disk changes and arthritic changes of the cervical spine. He recommended a cervical CT myelogram and nerve conduction study with EMG of the right arm.

On September 29, 2003, Dr. Long wrote to Plaintiff's counsel, noting that her initial injury occurred on February 18, 2002 (R. 223). Originally most of her pain was in the right shoulder, but "[o]ver the last several months, the pain was also involving her neck but never really resolved from her shoulder. I believe this is all the same initial injury." "Also, over the course of several months she was having radicular symptoms consistent with this central narrowing with pain and numbness, tingling, and weakening down her right arm. . . ."

Upon examination, Plaintiff had tenderness over the right side of her neck along the paravertebral muscles of the cervical region. The pain continued with palpation down over the superior trapezius and around the AC joint. Grip strength was intact. She had decreased sensation of the right hand in the third, fourth, and fifth digits. Reflexes were intact. She had significantly decreased range of motion over the horizontal of the right shoulder as well as internal and external rotation secondary to pain. No obvious atrophy was noted.

Dr. Long opined that Plaintiff had continued right shoulder and neck pain, and believed "this has all occurred from the initial injury; however, her neck pain was not further worked up until recently secondary to the lack of radicular symptoms until the last several months." He felt she was not at maximum medical improvement and wanted further workup. He considered her temporarily totally disabled, but noted he was not a certified IME.

On November 3, 2003, Dr. Long wrote to the State Department of Health and Human

Services, stating that he believed Plaintiff's chronic shoulder and neck pain with weakness and pain down into her right arm were all related to her initial work injury on February 18, 2002 (R. 222). He stated: "She is currently unable to work at this time, certainly at her old position, as she continues to have pain most of the day and exacerbation of pain and weakness in her right arm, shoulder, and neck with any significant activity such as lifting, pulling or reaching over her head."

A November 4, 2003, cervical myelogram showed mild extradural filling defects at the left C4-5 and the right C6-7 foramina (R. 221).

A CT of the cervical spine that same day indicated right C4-5 and left C6-7 filling defect and foraminal narrowing.

The EMG performed on November 12, 2003, was normal (R. 160). There was no evidence of right cervical radiculopathy.

Plaintiff saw Dr. Boling again on December 15, 2003 (R. 156). She continued to complain of neck pain and bilateral arm pain, right more than left. She had some numbness over the bilateral arms, right more than left, which was relieved by using her arms. She had some aggravation of the symptoms when relaxing her arms. She continued to drop things with both hands, worse on the right.

Plaintiff's examination was unchanged. Motor, sensory and cerebellar functions were intact. She had positive Hoffman's on the right, negative on the left, and negative for clonus. The EMG was reviewed and found to be normal without any evidence of cervical radiculopathy. Review of the CT myelogram showed a C6-7 degenerative disk disease with mild disk herniation but with no significant nerve root compression or stenosis. There was no indication of benefit from surgical intervention. The doctor recommended pain clinic and epidural injections and a referral to

15

rheumatology.

A December 16, 2003, examination by Dr. Long revealed tenderness to even light palpation over the neck, paracervical muscle, trapezius, and right shoulder. Plaintiff had full range of motion, reflexes were intact, and grip strength was equal in both hands. He noted the EMG showed no evidence of cervical radiculopathy and the CT showed a right C4-5 and left C6-7 filling defect and foraminal narrowing.

Dr. Long assessed chronic neck pain secondary to changes noted on the CT scan, as well as right shoulder pain secondary to AC arthrosis/strain with ongoing pain. He noted that, although Plaintiff complained of radicular symptoms and weakness, there was no evidence of this on EMG.

Plaintiff filled out an Activities of Daily Living form on February 23, 2004 (R. 70). She stated she had trouble sleeping at night, and that this was a change since her condition began, because: "I stay up later than before I got hurt. I sometimes don't go to bed until 3 or 4 o'clock in the morning or I wake up in the night in pain." She stated she took naps during the day "Sometimes when I can't sleep at night." Plaintiff stated she needed no help with any of her personal needs or grooming except " I need help with shaving my legs because I can't reach without pain and washing my back and hair." She stated that her teen-aged daughters helped her with these. She made cereal and sometimes eggs and toast for breakfast, made sandwiches or soup for lunch, and made soups for dinner "or sometimes my girls will help me make dinner." She said this was a change because she used to make all of her own meals herself without any help and now she could not make a big meal by herself. Plaintiff stated that the only work she performed around the house was paying bills and washing dishes. Her daughters helped her make her bed "and have learned how to do the rest since I have gotten hurt." Also, "My daughters have learned to do what I can't so they do it when it needs

16

done." This was a change since her condition began "because I did it all myself until I got hurt."

Plaintiff shopped only for food and medication, spending only as much time as it took to get what she needed. She used to love to go shopping "But now I don't because it makes my arms hurt to do it. Someone has to go with me to push the cart and to help me." Someone also went with her "Because I don't drive and I have to have someone to help me with the cart." (The undersigned notes that Plaintiff has never had a driver's license.)

Under "Activities and Interests" Plaintiff checked off only that she listened to the radio "sometimes" and watched TV "All day" (R. 72). She had had hobbies but did not do "much of anything because it makes my arm and upper back hurt." She visited or received visits from relatives and friends once or twice a week for about an hour. She only left home to go to the doctor and to the store when necessary. Where asked if her social activities had changed since her condition began, she checked "Yes, . . . .Because I was able to work outside of my house and do the things I loved to do and now I can't without pain." She had no problem getting along with other people. She had no problem concentrating; she had trouble finishing tasks or chores "Because it takes me 3 to 4 hours to get my dishes done because I can only do a little bit at a time." She had no problem following written or spoken instructions. She said, however, that her ability to concentrate, complete tasks, or follow instructions changed "because it takes me so long to get things done that I'm in pain just from the little things that I can do."

On her Personal Pain Questionnaire, Plaintiff wrote that her pain was in her upper back, shoulder and arm on the right side mostly, but sometimes in both arms (R. 77). She had the pain "all the time." She described the pain as "I have aching pain if I work the arm a lot it is stabbing pain down the arm." Where asked how bad the pain was, she responded: "Because I have aching pain

all the time and if I over work the arm the pain worsens. I can't lift over 15 pounds and can't pull or push." Where asked what caused the pain or made it worse, she wrote, "trying to do more that I can, like running the vacuum or dusting furniture." The only relief she got was from "just sitting and relaxing the arm and not using it and the med."

Plaintiff listed her medications as cyclobenzaprine at bedtime, which relieved the pain "sometimes," diclofenac which relieved the pain "sometimes," and hydrocodone twice a day which relieved her pain "sometimes." She had side effects of "sometimes I get a upset stomach so I take all of the pills with food and that [seems] to help."

On March 3, 2004, State agency decision maker James Kuzniar completed a Physical Residual Functional Capacity Assessment ("RFC") based on Plaintiff's degenerative disk disease and AC arthrosis and fibromyalgia, finding Plaintiff could lift 50 pounds occasionally; 25 pounds frequently; could sit about six hours in an eight-hour workday; and could stand/walk about six hours in an eight-hour workday. She would be limited to "frequently" performing all posturals. She would have no manipulative limitations. She would need to avoid concentrated exposure to extreme cold and heat. Dr. Kuzniar opined that Plaintiff's symptoms were attributable to a medically determinable impairment. He found her complaints were credible, and reduced her RFC to medium.

On March 9, 2004, Plaintiff reported pain, worse at night, that was waking her up in the middle of the night. Upon examination, she had full range of motion of the right shoulder, although she "tend[ed]" to have pain lifting above the horizontal. She was tender to palpation on the right paravertebral muscles and cervical region as well as superior trapezius and around the AC joint. There was no swelling or edema, reflexes were equal bilaterally and intact, with no neurologic deficits.

Dr. Long assessed chronic neck and right shoulder pain secondary to AC arthrosis/strain (R. 218).

An April 13, 2004, examination by Dr. Long showed Plaintiff's neck had full range of motion (R. 217). She had tenderness around the right paravertebral muscles and right AC joint and posterior shoulder and trapezius. She had certain trigger points that were much more tender than others. Dr. Long assessed "Chronic neck and right shoulder pain secondary to initial injury, a Workers' Comp claim, including right shoulder strain, AC arthrosis." She also had a diagnosis of some narrowing by CT and had already had a neurosurgical consult.

On May 14, 2004, Dr. Long wrote to Workers' Compensation stating he had been seeing Plaintiff since July 2002 "for an injury on February 18, 2002 (R. 216)." He requested a trial of epidural steroid injections.

On May 28, 2004, State agency reviewing physician Thomas Lauderman, D.O., completed an RFC finding that Plaintiff could occasionally lift 20 pounds; frequently lift 10 pounds; stand/walk about 6 hours in an 8-hour workday and sit about 6 hours in an 8-hour workday (R. 175). She could occasionally perform all postural motions. She should avoid concentrated exposure to temperature extremes and hazards. Dr. Lauderman found Plaintiff's credibility was not an issue and reduced her RFC to light due to pain and fatigue.

On June 8, 2004, Dr. Long examined Plaintiff finding her exam unchanged, with some tenderness over the right superior trapezius, around the AC joint, and some trigger points and tenderness further down all over her scapula and the right shoulder. She had full passive range of motion, but actively could only get just above horizontal secondary to pain. Her grip strength was normal. The assessment was "Chronic right shoulder pain from original right shoulder strain. Also

over the last several months, we have found some minimal cervical disk disease . . ." Dr. Long requested a functional capacity evaluation for any limitations in her ability to return to work to present to her employer.

On July 7, 2004, Plaintiff presented to James Wiley, M.D. for an Independent Medical Examination for the Workers' Compensation Division (R. 199). She was currently taking Hydrocodone APAP 5/500, Flexeril, Diclofenac and Ranitidine. She said she had had steroid shots in the shoulder twice but they did not help.

Plaintiff told Dr. Wiley she was at work doing dishes when she developed sudden pain in her shoulder with radiation as far as the right hand. She was seen by Family Medicine two days later due to increasing pain in the shoulder and base of neck area. X-rays showed no fracture. She was placed on medication and physical therapy. The doctor believed she had sustained a right trapezius strain. Her compensation claim decision was sprain/strain of right shoulder.

Dr. Wiley noted Plaintiff's evaluation of April 30, 2002, showed improvement and she was allowed to return to modified work May 6; reevaluation May 22 continued modified work; re-evaluation November 20, 2002, noted right shoulder strain with impingement, diagnosis of AC arthrosis, and MRI showed no cuff tear; May 29, 2003, diagnosis by Dr. Thrush of right shoulder sprain and chronic subacromial bursitis and tendinitis; June 24, 2003, MRI indicating disc herniation extrusion type C6-7 with mild central canal and left neuroforaminal narrowing, and numerous lymph nodes, not abnormally enlarged; September 22, 2003, evaluation by neurosurgeon Boling, who recommended cervical CT scan/ myelogram and nerve conduction study with EMG; December 16, 2003, recommendation by Dr. Boling that Plaintiff see pain clinic for injections and a rheumatologist for possible fibromyalgia; EMG with no evidence of cervical radiculopathy; and CT/myelogram

showing herniated disc and foraminal narrowing.

Plaintiff told Dr. Wiley that she had improved in some aspects but was unchanged in others. She stated she had attempted to return to work (at light duty) and after 90 days was unable to progress to regular duty and was thus discharged August 5, 2002. Physical therapy helped at first. Plaintiff currently complained of pain in the posterior of the right shoulder and base of the right side of the neck, stating the pain began suddenly at the time of injury. The pain was present all the time and varied in intensity. It extended into the right arm with associated numbness and tingling and pain extending to the third, fourth, and fifth fingers of the right hand. The pain was made worse by sneezing, lifting, pushing or pulling. It awakened her at night, so she could sleep only about three hours. She could not drive (again, she had never obtained a license), and had headaches about once a week.

Upon physical examination, Plaintiff had normal stance and gait and her shoulders were level with minimal forward head thrust. She had mild increased dorsal kyphosis and no scoliosis. There was tenderness in the area of the AC joint and anterior joint on the right; tenderness in the rotator cuff; and worse tenderness in the anterior trapezius, brachial plexus, and elevator. There was also tenderness in the mid to lower cervical spine. Pulses were good. She had normal thenar and hypothenar eminences bilaterally. Negative signs for carpal tunnel except for mild ulnar symptoms on percussion of the right wrist. She had mild cubital tunnel syndrome on the right, with no gross laxity of the nerve. She had diminished sensation in the third, fourth, and fifth fingers of the right hand. Deep tendon reflexes were active and equal. Both arms were equal in circumference. She had mildly diminished grip strength on the right. She had good arm and shoulder strength bilaterally but stresses cause pain in the right shoulder and neck.

Dr. Wiley diagnosed right shoulder sprain, cervical spine sprain, and cubital tunnel syndrome on the right (R. 204). He recommended Plaintiff remain temporarily totally disabled, have cervical injections, and be additionally diagnosed by Workers' Compensation with cervical sprain.

On August 3, 2004, Dr. Holly Freed of Family Medicine examined Plaintiff (R. 213). Her exam showed point tenderness with palpation along the cervical spine worse over C6-7; decreased motion of the cervical spine; decreased motion of the right arm; and numbness and tingling in the fourth and fifth digits. Dr. Freed assessed Plaintiff with chronic right shoulder pain and cervical strain.

On September 7, 2004, Dr. Freed noted Plaintiff had point tenderness with palpation along the cervical spine, in the C6-7 region as well as point tenderness over the rhomboid muscle, AC joint, and distal point of her shoulder. She had decreased range of motion of the cervical spine and right arm. She had numbness and tingling in her 4th and 5th fingers. Reflexes were difficult to elicit due to "guarding." Dr. Freed assessed chronic right shoulder pain/strain with cervical strain by compensation.

On November 16, 2004, Dr. Freed found Plaintiff had tender points along the left cervical spine, left trapezius, and left rhomboid and deltoid muscles. She had decreased range of motion of the cervical spine and right arm, and numbness and tingling in the third, fourth, and fifth fingers of the right hand. Dr. Freed assessed chronic right shoulder pain/strain with cervical strain by compensation and depression secondary to chronic pain.

On January 11, 2005, Dr. Freed found Plaintiff had tender points along the musculature of the left cervical spine, left trapezius, left rhomboid and deltoid, decreased range of motion of the right arm, and numbness and tingling in the third, fourth, and fifth fingers. She was assessed with

chronic right shoulder pain/strain with cervical strain by compensation.

On March 23, 2005, Dr. Freed found Plaintiff had tender points along the left cervical spine, left trapezius, rhomboid, and deltoid muscles, decreased range of motion of the right arm, and intermittent numbness and tingling of her third, fourth, and fifth fingers on her right hand, with weakness in the right arm of 4/5 versus 5/5 on the left. She diagnosed chronic right shoulder pain/strain with cervical strain by compensation.

At the Administrative Hearing held on April 7, 2005, Plaintiff testified that her right arm went "into spasms" when she wrote with it or when she was doing dishes. It took her 3-4 hours just to wash the dinner or breakfast dishes. She would wash the glasses, then go sit down, then go back and do a little more, then sit down again. She would lose strength in the right arm with no forewarning, and lose her grip. She had dropped coffee cups, for example.

Plaintiff did not drive, but never had. She had obtained her driving permit only about two months before her work injury. She testified she could only write one word at a time. She could write one check, but it would take her a little while. She would write one, and then wait for a couple of minutes, and do the next. She could not pick up a gallon of milk. She could pick up a coffee cup "to a certain point." She could not pick up coins because of the numbness in her fingers, stating that they stayed numb all the time. She testified there were times that she was in pain constantly, the constant pain being between a 3 and 4 on a scale of 0 to 10. She testified that the more she used the arm the more severe the pain became. After doing the dishes, for instance, she had to get in a comfortable position, put a heating pad on the arm, then ice it for probably an hour or two. She said her doctors told her to use her arm and push it, but if she did she was in severe pain.

Plaintiff testified she had no side effects from medication except the Flexeril made her go

to sleep (which was its purpose). Her concentration was good some days and bad others. She did not watch much television anymore because she could not sit long enough to get interested in it.

When asked if she cooked for her family, Plaintiff responded: "My girls help me." They were 16 and 17 at the time. She cooked "some." She had no income, but had 11 brothers and sisters who were helping her, plus food stamps and a medical card.

The ALJ asked the VE to assume a hypothetical individual of claimant's age, education, and work background who could perform a range of sedentary work with a sit/stand option; only occasional postural movements (no climbing); with no overhead reaching or lifting or pushing or pulling with the right arm. The person would have to be able to mostly look straight ahead without repetitive neck movements. She should not be exposed to any temperature extremes, dampness or humidity. The VE testified such an individual could perform the work of a surveillance system monitor, 12,947 jobs nationally and 13 locally (defined as 20% of West Virginia jobs); or information clerk 93,755 jobs nationally, 77 locally (R. 287). He testified that neither job entailed much use of the hands or much writing.

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant's degenerative disc disease/chronic strain/sprain of the cervical spine; chronic strain/sprain/subacromial joint bursitis and tendinitis of the right shoulder are considered "severe" based on the requirements in the Regulations 20 CFR §§

24

404.1520(c) and 416.920(c).

4.    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4.

5.    The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.    The claimant has the following residual functional capacity: the claimant is able to perform. [sic]

7.    The claimant is unable to perform any of her past relevant work (20 CFR §§ 404.1565 and 416.965).

8.    The claimant is a "younger individual" (20 CFR §§ 404.1563 and 416.963).

9.    The claimant has a "high school (or high school equivalent)" education (20 CFR §§ 404.1564 and 416.964).

10.    The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

11.    The claimant has the residual functional capacity to perform a significant range of sedentary work (20 CFR §§ 404.1567 and 416.967).

12.    Although the claimant's exertional limitations do not allow her to perform the full range of sedentary work, using Medical-Vocational Rule 201.28 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as a surveillance system monitor and an information clerk. These jobs are consistent with the *DOT*.

13.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

(R. 22).

## IV. Contentions

A.    Plaintiff contends:

1.    The ALJ's credibility/pain evaluation is fatally infirm as he fails to state logical reasons or cite substantial evidence supporting the conclusion, and by seizing upon minutiae, sometimes incorrectly; and

2. There are only 13 and 77 positions in the local economy listed by the VE which the claimant could perform, and that does not constitute significant numbers.

B. The Commissioner contends:

1. The ALJ considered all of Plaintiff's symptoms, including her complained-of pain, and he evaluated the extent to which they could reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 C.F.R. §§ 404.1529, 416.929, when he assessed her RFC.

2. The Act provides that a claimant is not disabled if she can perform work which exists in significant numbers in either the region where such individual lives or in several regions of the country.

## V. Discussion
### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971)(citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir.

1987).

## B. Credibility

Plaintiff first argues that "the ALJ's credibility/pain evaluation is fatally infirm as he fails to state logical reasons or cite substantial evidence supporting the conclusion, and by seizing upon minutiae, sometimes incorrectly." Defendant contends the ALJ considered all of Plaintiff's symptoms, including her complained-of pain, and he evaluated the extent to which they could reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 C.F.R. §§ 404.1529, 416.929, when he assessed her RFC.

The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)). In Craig v. Chater, 76 F. 3d 585 (4th Cir. 1996), the Fourth Circuit described the factors the ALJ was required to consider in making the pain and credibility determination as follows:

> Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3).

Craig, supra at 594. Additionally, Social Security Ruling ("SSR") 96-7p provides:

> 4. In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons

about the symptoms and how they affect the individual, and any other relevant evidence in the case records. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

The ALJ's credibility analysis in this case is as follows, in its entirety:

The claimant was not entirely credible, based on some of her statements and other evidence in the record. She appears to be exaggerating her symptoms quite substantially in order to obtain benefits. For example, she stated that it takes her three to four hours to do the dishes, which the Administrative Law Judge finds to be incredible on its face. She states that she is able to only write one word or perhaps one check at a time and then must stop and rest. She testified that she sometimes has problems lifting even a coffee cup. This is in sharp conflict with her own statement in her disability report that she cannot lift more than fifteen pounds, clearly implying that she is able to lift fifteen pounds and less. (Exhibit 1E). The Administrative Law Judge also does not find credible the claimant's statements that she takes naps during the day because she cannot sleep at night. The claimant has no medically determinable impairment that would reasonably be expected to make her unable to sleep at night yet able to sleep during the day. If the claimant does indeed take naps in the daytime, the administrative Law Judge believes that this is more of a lifestyle choice, as it is clearly not shown to be a medical necessity. As discussed in more detail below, the objective medical evidence falls far short of supporting the severity of the claimant's subjective complaints regarding her symptoms and limitations. The Administrative Law Judge further notes that claimant has a rather mediocre work record, indicating a less than ardent desire to be gainfully employed. She does do a certain amount of housework although she states that she receives help from her daughters. The claimant also shops. Primarily, it appears that her major activity is watching television all day. (Exhibit 3E).

For the above reasons, the Administrative Law Judge does not find the claimant to be credible and does not accept her statements concerning her symptoms and limitations. The claimant has medical impairments that could reasonably be expected to cause some of the symptoms described, and the Administrative Law Judge does believe that she does experience neck and shoulder pain from time to time, but not to the frequency and severity alleged. In view of this determination concerning the claimant's credibility, the Administrative Law Judge does not accept medical findings or opinions that are based solely or primarily on the claimant's subjective complaints.

(R. 18-19).

The undersigned finds the ALJ's analysis insufficient under both the Ruling and <u>Craig</u>. The

decision recites some, but not much, of Plaintiff's medical history. Regarding "statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual," for example, the ALJ discussed only Dr. Wiley's one-time examination for the workers' compensation division (rejecting the opinion that Plaintiff was temporarily totally disabled), one report by treating physician Freed (rejecting her opinion), and State Agency reviewing physician Thomas Lauderman's residual functional capacity assessment. Most notably, the opinion does not mention long-time treating physician Dr. Long at all.

The Fourth Circuit has held: "Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983).

20 C.F.R. § 404.1527 states:

> (d) *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion
>
>> (1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>>
>> (2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s)

and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

      (i) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

      (ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

(4) *Consistency.* Generally, the more consistent an opinion is with

the record as a whole, the more weight we will give to that opinion.

SSR 96-2p, regarding treating physician opinions, provides as follows:

> Paragraph (d)(2) of 20 CFR 404.1527 and 416.927 requires that the adjudicator will always give good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s), i.e., an opinion(s) on the nature and severity of an individual's impairment(s). Therefore:
>
> When the determination or decision:
>> is not fully favorable, e.g., is a denial; or
>>
>> is fully favorable based in part on a treating source's medical opinion, e.g., when the adjudicator adopts a treating source's opinion about the individual's remaining ability to function;
>
> the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

The undersigned finds the ALJ's discussion of Plaintiff's treating physicians (including, but not limited to, Dr. Long and Dr. Freed) is insufficient under the Regulations, Ruling, and Fourth Circuit law. The only mention of Plaintiff's three years of treatment with Family Medicine is a March 23, 2005, office visit with Dr. Freed. It is undisputable that Dr. Freed was Plaintiff's treating physician. She herself saw Plaintiff on August 3, 2004, September 7, November 16, January 11, 2005, and March 23, 2005, ( the sole report mentioned by the ALJ). Additionally, Dr. Freed worked for Family Medicine, where Plaintiff was treated regularly and consistently since her work injury in February 2002. Yet the ALJ's entire discussion of Dr. Holly Freed is as follows:

> On March 23, 2005, Holly Freed, M.D., noted, that the claimant has a chronic right shoulder strain with a cervical strain by compensation. As stated above the cervical MRI did show a mild disk herniation at C6-7/ Dr. Freed stated that the claimant was currently unable to work because of pain, numbness, weakness and decreased range of motion in the right upper extremity (Exhibit 8F). The Administrative Law Judge does not find these limitations to be credible, with appropriate right upper extremity limitations in place.

In addition, Dr. Long examined and treated Plaintiff consistently on numerous occasions from about July 2002, through June 2004, when Dr. Freed took over. Yet there is no discussion of Dr. Long's treatment or opinions. The undersigned therefore finds the ALJ's consideration of the opinion evidence in this matter is insufficient under the Regulation, the ruling, and Fourth Circuit law.

Additionally, there is no mention in the ALJ's decision of "any medical treatment taken to alleviate [the pain]." Plaintiff's use of prescription pain medications, steroid injections, and courses of physical therapy all went unmentioned by the ALJ.

Additionally, the ALJ, while discussing the examination performed by James Wiley for Workers' Compensation, writes:

> The Administrative Law Judge notes in passing that disability does seem to run in the claimant's family, as her mother is disabled with a leg injury and her brother is disabled due to back problems.

(R. 19). The undersigned agrees with Plaintiff that this statement is improper.

For all the above reasons the undersigned finds the ALJ's credibility analysis is insufficient under the Regulation, the Ruling or Craig.

Because the undersigned finds the ALJ did not properly evaluate the opinion evidence or Plaintiff's credibility, it follows that his RFC, hypothetical to the VE, and ultimate conclusion are also not supported by substantial evidence.

## C. Number of Jobs

Plaintiff next argues: " There are only 13 and 77 positions in the local economy listed by the VE which the claimant could perform, and that does not constitute significant numbers." The undersigned does not agree. Under 42 U.S.C. §§ 423(d)(2)(A), a claimant is not disabled if she can perform work which exists in significant numbers in either the region where such individual lives

or in several regions of the country." Under the Regulations, it does not matter whether work exists in the immediate area in which the claimant lives. 20 C.F.R. §§404.1566(a0(1). In <u>Hicks v. Califano,</u> the Fourth Circuit stated: "We do not think that the approximately 110 jobs testified to by the vocational expert constitute an insignificant number." 600 F.2d 1048 (4th Cir. 1979). In this case, the VE testified there would be over 100,000 jobs available in the national economy. Although he testified there would be only 90 jobs in the local economy, significantly, he defined the local economy very narrowly, as 20% of the jobs in the state of West Virginia. The undersigned finds the VE was testifying as to a very small "region," and that, therefore, his finding of 90 jobs is at least equal to the finding of 110 jobs in the regional economy in <u>Hicks</u>.

## VI. RECOMMENDATION

For the reasons herein stated, I find that substantial evidence does not support the Commissioner's decision denying Plaintiff's applications for SSI and DIB. I accordingly recommend Defendant's Motion for Summary Judgment [Docket Entry 20] be **DENIED,** and Plaintiff's Motion for Summary Judgment or, in the Alternative, Motion to Remand [Docket entry 18 18] be **GRANTED in part,** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above

will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert. denied</u>, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this __*3*__ day of April , 2007.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE